David Bass and Augusta Bass, et al. [1] v. Commissioner. Bass v. Commissioner
Docket Nos. 57786, 58437, 58470.
United States Tax Court
T.C. Memo 1959-3; 1959 Tax Ct. Memo LEXIS 246; 18 T.C.M. (CCH) 10; T.C.M. (RIA) 59003; January 14, 1959
Bernard Haselkorn, Esq., for the petitioners. Jules W. Breslow, Esq., and Martin D. Cohen, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In Docket No. 58437 respondent determined a deficiency in Federal income taxes for the calendar year 1950 in the amount of $2,129.51. That part of this deficiency is here in issue which arises from respondent's determination that a premium received by the corporate taxpayer on a mortgage note was not amortizable but constituted income *247 in its entirety in the year of its receipt. In Docket Nos. 57786 and 58470 respondent determined deficiencies in Federal income taxes of the individual taxpayers for the calendar year 1950 in the respective amounts of $4,561.88 and $3,315.40. These deficiencies arise from respondent's determination that certain distributions received by taxpayers in that year from Parkway Manor, Inc. (the taxpayer in Docket No. 58437), did not constitute capital gains but were ordinary income taxable as such. [2]
Findings of Fact Many of the facts have been stipulated by the parties. We find those facts to be as stipulated and incorporate herein by this reference the stipulation and the exhibits attached thereto and identified therein. Petitioner Parkway Manor, Inc. (hereinafter *248 referred to as Parkway), was incorporated on July 20, 1949, for the purpose of constructing and operating housing projects. On August 15, 1949, Parkway purchased from William B. Greenstein (who is the William B. Greene appearing as one of the petitioners in Docket No. 58470) land located at 149th Street and 79th Avenue, Flushing, in the city of New York, for the sum of $21,685.15. All of its common stock was owned by the individual petitioners. Jacob W. Friedman, an attorney, was employed to act as agent in securing mortgage financing for a housing project to be constructed by Parkway under section 608 of the National Housing Act. On January 24, 1949, the Jamaica National Bank of New York, as proposed mortgagee, made an application to the Federal Housing Commissioner for mortgage insurance under section 608 of the National Housing Act in the amount of $357,000 on behalf of Parkway as proposed mortgagor. In the application William B. Greenstein was named as sponsor. On June 6, 1949, the Federal Housing Administration (hereinafter referred to as F.H.A.) issued a commitment for insurance in the amount of $343,500, covering a 4 per cent interest-bearing loan from Jamaica National *249 Bank to Parkway. On September 23, 1949, Parkway and the Jamaica National Bank executed a building loan agreement whereby the bank agreed to lend to Parkway $343,500 upon the latter's 4 per cent note secured by a mortgage on its property, and on the same date Parkway executed this note payable to the bank or its order. Also on the same date Parkway executed an architect's agreement whereby an architect's services were obtained by Parkway in return for the latter's obligation to pay the architect $8,570.50. The building loan agreement provided, inter alia, that Parkway was to erect a rental housing project within 10 months according to the approved plans and specifications, that Parkway should be paid advances under the agreement as the work progressed, and that "[upon] completion of the improvements, including all landscape requirements and off-site utilities and streets, the balance due the Borrower hereunder shall be payable upon the expiration of 30 days from the date of final completion * * *." Under date of September 25, 1950, the Jamaica National Bank in a "Request for Final Endorsement of Credit Instrument" advised the F.H.A. that the construction of the Parkway project *250 was complete, and that advances to Parkway under the building loan agreement had been made in the total amount of $343,500 on the dates and in the amounts as follows: 9/23/49
$13,105.80
11/10/49
52,429.50
12/20/49
41,839.68
1/16/50
38,030.59
2/27/50
35,249.10
3/30/50
17,077.06
4/17/50
56,778.54
5/31/50
36,754.05
7/17/50
15,799.82
9/25/50
36,435.86
On September 5, 1950, the district director of the F.H.A. advised the Jamaica National Bank that the work on the Parkway project had been completed with the exception of a curb, a sidewalk, and certain pavement estimated to cost an aggregate amount of $549. The payment of the costs of these items was taken care of by an escrow agreement executed on September 25, 1950, and their construction was completed shortly thereafter. On May 15, 1950, the Department of Housing and Buildings of the city of New York issued a "Certificate of Occupancy" relating to the building erected by Parkway in which it was stated that the date of its completion was May 11, 1950. Stern Lauer & Co., then located at 30 Pine Street, New York City, was commissioned by Jacob W. Friedman to act as mortgage broker in placing the permanent *251 mortgage loan. Stern Lauer & Co., by letter dated April 12, 1949, offered the note and mortgage to the Eastchester Savings Bank provided the latter paid a premium of $4 per $100 of mortgage indebtedness. On April 29, 1949, the Eastchester Savings Bank approved the purchase of this note and mortgage by assignment from Jamaica National Bank at the price offered and the actual assignment of the note and mortgage from Jamaica to Eastchester occurred on September 29, 1950. On or about October 4, 1950, Parkway received from the Jamaica National Bank the net premium on the mortgage note in the amount of $12,865.15. Parkway by its president, William B. Greenstein, and its secretary, David Bass (one of the petitioners in Docket No. 57786), represented to the Jamaica National Bank that in its opinion and the opinion of its counsel no Federal documentary stamp tax was due and payable in connection with the issuance of its mortgage note, as would have been necessary had it been a corporate bond. Parkway has at all times kept its books and records and filed its tax returns on a calendar year basis using the accrual method of accounting. The individual petitioners used the cash receipts and *252 disbursements method of accounting. For Federal income tax and internal accounting purposes Parkway offset the amount of $12,865.15, premium received and recorded in an account described as "Prepaid Mortgage Premium" by $9,220 of mortgage expense and amortized the difference of $3,645.15 over the life of the mortgage, 391 months. Approximately halfway through the period of construction the individual petitioners became aware that the building loan would exceed the cost of construction. After becoming aware that this surplus existed, these petitioners consulted with their accountant to determine how this money could be withdrawn from the corporation at its most advantageous tax benefit to the stockholders. On September 30, 1950, the value of the land and building was increased on the books of Parkway in the respective amounts of $3,278.25 and $40,482.29. These increases were based upon an appraisal of the property. On the books of the corporation the increases in the value of the land and building were credited to an account called Capital Surplus. The actual cost of construction of the building as shown by Parkway's books was $284,438.66, as shown by their "building account. *253 " On September 30 journal entries were made to increase this account by $40,482.29, the amount of the write-up attributed to the building, and to decrease this account by $53,809.69 worth of fixtures, equipment, and furnishings which could be depreciated at a faster rate for tax purposes. Depreciation over a 50-year period was computed using a basis of $325,000 and respondent disallowed that portion of the depreciation deduction which pertains to the $40,482.29 write-up. This disallowance of depreciation pertaining to the write-up is not contested by the corporate petitioner. On September 30, 1950, four checks were issued as follows: William B. Greenstein (Greene)
$9,500
Hazel L. Greenstein (Greene)
9,500
Augusta Bass
9,500
David Bass
9,500
The entry on the books of the corporation which reflected the above distribution was a debit to Capital Surplus of $38,000 and a credit to Cash of $38,000. The four persons above each owned a 25 per cent interest in the common stock of Parkway. On their tax returns for the year 1950 each of the above petitioners reported the distribution of $9,500 received from Parkway as capital gain. Parkway was formed or availed *254 of principally for the construction of a housing project with a view to the realization by the individual petitioners as stockholders of gain attributable to such property through a distribution to them of cash before the realization by Parkway of a substantial part of the net income to be derived from such housing project. The gain realized by the individual petitioners in the taxable year by reason of the cash distribution to them of the aggregate amount of $38,000 is to be considered as gain from the sale or exchange of property which is not a capital asset in accordance with the provisions of section 117(m)(1), Internal Revenue Code of 1939. Opinion KERN, Judge: Two questions are presented herein for our decision. The first is whether the premium received by the corporate petitioner on the sale of its mortgage note was amortizable or constituted income taxable to petitioner corporation in the year of its receipt without amortization. The second is whether the cash distributions made to the individual petitioners in the taxable year were taxable as capital gains or as ordinary income under the provisions of section 117(m) of the Internal Revenue Code of 1939. [3]
*255 We decide the first question in favor of respondent on the authority of Bayshore Gardens, Inc., 30 T.C. 1292 (Sept. 29, 1958), on appeal (C.A. 2). We decide the second question in favor of respondent on the authority of Rose Sidney, 30 T.C. 1155 (Aug. 25, 1958), and cases therein cited. Decisions will be entered for the respondent. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Parkway Manor, Inc., Docket No. 58437; William B. Greene and Hazel Greene, Docket No. 58470.↩
2. In Docket No. 57786 the statement attached to the notice of deficiency says that "cash distributions * * * are fully taxable * * * at ordinary income tax rates under the provisions of the Internal Revenue Code of 1939." In Docket No. 58470 the statement says that "the cash distribution * * * is ordinary income within the purview of either section 22(a) or section 117(m) of the Internal Revenue Code of 1939↩, or both."
3. SEC. 117. CAPITAL GAINS AND LOSSES. (m) Collapsible Corporations. - (1) Treatment of Gain to Shareholders. - Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset. (2) Definitions. - (A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to - (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and (ii) the realization by such shareholders of gain attributable to such property. (B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, or produced property, if - (i) it engaged in the manufacture, construction, or production of such property to any extent, (ii) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, or produced the property, or (iii) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, or produced by the corporation. (3) Limitations on Application of Subsection. - In the case of gain realized by a shareholder upon his stock in a collapsible corporation - (A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced; and (C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production. For purposes of subparagraph (A), the ownership of stock shall be determined in accordance with the rules prescribed by paragraphs (1), (2), (3), (5), and (6) of section 503(a), except that, in addition to the persons prescribed by paragraph (2) of that section, the family of an individual shall include the spouses of that individual's brothers and sisters (whether by the whole or half blood) and the spouses of that individual's lineal descendants.↩